# IN THE COURT OF APPEALS OF IOWA

No. 15-1073
Filed September 14, 2016

IN RE THE MARRIAGE OF CONSTANCE G. PAUSCHER
AND CURTIS R. PAUSCHER

Upon the Petition of
CONSTANCE G. PAUSCHER,
      Petitioner-Appellant,

And Concerning
CURTIS R. PAUSCHER,
      Respondent-Appellee.

_____

Appeal from the Iowa District Court for Polk County, Dustria A. Relph, Judge.

Constance Pauscher appeals the physical care, property valuation, and property distribution provisions of the decree dissolving her marriage to Curtis Pauscher. **AFFIRMED AS MODIFIED AND REMANDED.**

Amanda L. Green of Nading Law Firm, Ankeny, for appellant.

Alexandra D. Frazier of R.J. Hudson Law Firm, P.C., West Des Moines, for appellee.

Considered by Vaitheswaran, P.J., and Doyle and Mullins, JJ.

**MULLINS, Judge.**

Constance Pauscher appeals the physical care, property valuation, and property distribution provisions of the decree dissolving her marriage to Curtis Pauscher. Constance argues the district court erred in granting physical care of the parties' minor children to Curtis, or in the alternative, erred in limiting her visitation with the children. Constance further argues the district court erred in valuing Curtis's retirement account at the time of separation rather than at the time of trial and erred in failing to award Constance a property settlement. We affirm as modified and remand.

**I. Background Facts and Proceedings**

Constance and Curtis were married in 2005. They have three minor children, born in 2006, 2008, and 2011. Constance is employed as a registered nurse in Des Moines, where she works as a critical care nurse three evenings per week making $46,000 per year. Constance obtained her associate's degree in nursing in 2008 and has numerous certifications. While attending school, Constance also worked part-time and cared for the parties' children. Curtis is employed as a union journeyman pipe insulator and has worked for the same union shop since before the parties were married. His earnings are $54,288 per year.

During the marriage, Constance was the primary caregiver for the children. Though Curtis currently works from 7:00 a.m. to 3:30 p.m., he previously traveled as part of his job and sometimes would be out of town on

assignment for months at a time.[1] Prior to separating, the parties resided together in Alleman.

At trial, Constance testified to certain events during which Curtis was physically and mentally abusive during the marriage and that, after the death of his brother, Curtis started and continued to abuse alcohol. Constance's father also testified that Curtis's anger and drinking intensified in the months and years following his brother's death. He testified he saw Curtis intoxicated and intervened in disputes between Curtis and Constance, although he never saw Curtis commit acts of physical assault against Constance. He also testified Curtis confirmed to him the alleged incidents of abuse. Constance's father also testified—and Curtis and Constance confirmed—that Constance's father often served as a mediator in their marriage.

Curtis denied any abuse ever occurred, saying "She is saying what happened, but she is saying it the wrong way." As an example, Curtis explained that one alleged incident of abuse did include a verbal fight between Constance and him, but there was never any physical violence on his part, rather Constance had thrown a phone at him. Curtis also denied the alcoholism,[2] but admitted he "us[ed] alcohol as medicine" following his brother's death in July 2006. Curtis indicated the self-medication lasted for only a few months, and he got better after engaging in counseling. Constance claimed financial difficulties and Curtis's

---

[1] Both Curtis and Constance agreed Curtis would take these long-distance assignments. On one occasion, during a seven-to-eight month assignment, Curtis saw Constance and the children approximately every other weekend. Normally, Constance brought the children to him.

[2] When Curtis was twenty, he was charged with operating while intoxicated for which he received a deferred judgment and successfully completed probation.

alcoholism led to the divorce. Curtis blamed the couple's financial problems on Constance taking the full amount of maternity leave after the birth of each child and being unable to keep her job while caring for the children when he was out of town.

In 2010, Constance and the eldest Pauscher child were involved in a serious car accident. Constance suffered serious injuries from the accident, for which she received a settlement of approximately $100,000, less attorney fees. The settlement was spent during the marriage on various items including a vacation, paying off Curtis's truck, purchasing another vehicle, and making mortgage payments.

In June 2013, the parties separated, and the petition for dissolution of the marriage was filed. Constance testified that, before leaving the marital home, she first asked Curtis to stay with his father and stepmother but he refused. She then moved out of the marital home with the children and into her parents' home in Slater. Constance was awarded temporary physical care of the children by order regarding temporary matters on July 15, 2013. Constance and the children then remained in Slater, where the children attended the local school district, which was different from their school system in Alleman.

The record reflects that, as the primary caregiver to the children, Constance kept Curtis informed of the children's activities and appointments through a jointly-shared, on-line calendar. Curtis testified Constance sent him emails about the children, she made sure he was on the schools' weekly emails, and he had access to the school information. Curtis stated Constance had done a good job of keeping him informed of the children's activities and events. During

the separation, Constance allowed Curtis time with the children in addition to that allocated under the temporary order.

However, the communication between Curtis and Constance has been strained and sometimes hostile. Part of the tension between the parties during the separation arose from the baptism of their eldest child. While married, all of the children received blessings from the church Constance attends. In 2014, Constance allowed, over Curtis's objections, the eldest child to choose to be baptized. The parties agree the child was baptized at a time that conforms with the standard practice of Constance's church. Curtis attended the baptism.

Both parties currently reside with their new significant others. Curtis lives in Ankeny with his girlfriend and her two children in a home the girlfriend owns. Constance lives in a rental home in Altoona with her fiancé, Jeffrey Glaspie. Constance moved to Altoona in February 2015, at which time the school-aged children changed school systems to the local school district. Curtis did not approve of moving the children mid-school year or before the divorce proceedings were complete. At all times, the school-aged Pauscher children have done well in school.

Part of the tension between the parties, to which the district court gave significant consideration, is Constance's relationship with Glaspie. Curtis has expressed his concerns about Glaspie to Constance, as Glaspie has picked the children up from school and monitored the children on the nights Constance is working. Glaspie has three previous domestic abuse charges, occurring

between 1993 and 2004.[3] Glaspie is employed by an information technology department and has five children. He and his ex-wife, Rhonda Connett, have four children together.

Connett has physical care of the children, and Glaspie has visitation. Connett and Glaspie have a very contentious relationship, and, at the time of trial, were seeking a modification of their divorce decree, with Glaspie seeking contempt charges against Connett. Connett testified at trial about the domestic abuse that allegedly occurred in their marriage and a suicide attempt by Glaspie, the latter of which occurred in 2011. She also testified that Constance and Glaspie had befriended Connett's current husband's ex-wife and, through that friendship, were causing issues.

At the time of trial, Glaspie had assault charges pending against him, was subject to a no-contact order with his twelve-year-old son, and had been placed upon the child abuse registry for an incident occurring at the boy's school. Arising from this incident, Glaspie had a founded Iowa Department of Human Services (DHS) claim for denial of critical care–failure to provide proper supervision, which Glaspie was appealing. DHS did not confirm the charge of physical abuse.[4]

---

[3] The record indicates Glaspie also had a theft charge.

[4] Limited record was made on this incident at trial. According to Constance's testimony, Glaspie had gone to his son's school to pick him up. He could not find his son, and his son was not answering his phone. When he found his son, he grounded him from his basketball game the following day. Connett arrived and said Glaspie could not ground their son. The boy went behind Connett and indicated he did not want to go with Glaspie. Glaspie grabbed the boy by the arm to escort him toward the door. The boy braced himself against the door, and Glaspie ran into him. The boy started throwing elbows and kicked Glaspie in the groin; Glaspie then bear-hugged the boy in an attempt to subdue his struggles.

At trial, evidence was also presented regarding a second alleged incident between Glaspie and his twelve-year-old son that had been reported by Connett. The accusations were investigated by DHS and the police. According to police reports entered into evidence after the trial, dated April 10 and 14, 2015, both DHS and the police believed Connett "exaggerated what [had] occurred . . . in an attempt to get [Glaspie] into trouble in a criminal matter." The police report stated "[n]one of the injuries were consistent with the facts in th[e] case" and, instead, the facts showed the injuries had been caused to try to get Glaspie arrested. The police officer further noted Connett knew some of the injuries on the child were caused by the child—or from other unrelated accidents—but did not share this fact with the police. When investigating, DHS spoke with a treating physician who contradicted the story provided by Connett. The police report indicates the charge was "unfounded" and a "false report" and states "this case is closed."

After Glaspie became involved with Constance, Connett reached out to Curtis and his girlfriend in October 2013. At trial, Curtis admitted he knew Connett did not have a good relationship with Glaspie and Constance; he had become good friends with Connett; he spent time with Connett socially a couple of times; and, though first denying his relationship with Connett could cause issues with Constance, he later admitted he thinks his relationship with Connett "adds fuel to the fire" regarding his disputes with Constance. Curtis testified he is aware Connett has multiple founded DHS reports against her, but indicated he might allow his children to be in her charge.

Constance and Connett also have a contentious relationship. Constance has been charged with harassment for a particularly inappropriate and offensive

email she sent to Connett after being warned by the police not to contact Connett. Constance has also brought her children along to custody exchanges between Connett and Glaspie of their four children. In some of the exchanges, Glaspie called the police for their intervention.

At trial, Curtis also expressed concern about the way in which Constance and Glaspie discipline the children and Constance's past refusal to allow the children to call him when in her care. Curtis's step-sister also testified that she disapproved of the discipline Constance used with the children while Constance and Curtis were married but she had not seen Constance since the separation. Constance's father also testified to an incident where he believed Curtis was aggressive toward one of the children while intoxicated.

Trial commenced on April 1, 2015. On May 22, 2015, the district court entered the decree of dissolution of marriage, awarding physical care to Curtis. On June 1, 2015, Constance filed a motion for stay and motion to enlarge or amend, the latter of which the district court denied without a hearing and the former of which the Iowa Supreme Court denied on July 9, 2015. Constance appeals.

## II. Scope and Standard of Review

We review dissolution cases, which are tried in equity, de novo. Iowa R. App. P. 6.907; *In re Marriage of Schenkelberg*, 824 N.W.2d 481, 483-84 (Iowa 2012). While we give weight to the factual findings of the district court, especially when considering the credibility of witnesses, we are not bound by them. Iowa R. App. P. 6.904(3)(g). "Precedent is of little value as our determination must

depend upon the facts of the particular case." *In re Marriage of Fennelly,* 737 N.W.2d 97, 100 (Iowa 2007) (citation omitted).

### III. Analysis[5]

### A. Physical Care

Where child custody and physical care are at issue in marriage dissolution cases, the primary consideration is the best interests of the children. Iowa R. App. P. 6.904(3)(o). We look to the factors listed in Iowa Code section 598.41(3) (2013): (1) whether each parent would be a suitable custodian for the children; (2) whether the psychological and emotional needs and development of the children will suffer due to lack of active contact with and attention from both parents; (3) whether the parents can communicate with each other regarding the children's needs; (4) whether both parents have actively cared for the children before and since the separation; (5) whether each parent can support the other parent's relationship with the children; (6) whether the custody arrangement is in accord with the children's wishes or whether the children have strong opposition, taking into consideration each child's age and maturity; (7) whether one or both the parents agree or are opposed to joint custody; (8) the geographic proximity of the parents; (9) whether the safety of the children, other children, or other parent will be jeopardized; (10) whether a history of domestic violence exists; and (11) whether either parent has allowed a sex offender access to the children. We

---

[5] In his brief, Curtis alleges Constance failed to preserve error on the admissibility of certain evidence. On appeal, Constance's challenge is not to the admissibility of evidence but the weight the district court granted that evidence; thus, error was preserved.

also look at the factors announced in *In re Marriage of Winter*, 223 N.W.2d 165, 166-67 (Iowa 1974):

> (1) The characteristics of each child, including age, maturity, mental and physical health.
> (2) The emotional, social, moral, material, and educational needs of the child.
> (3) The characteristics of each parent, including age, character, stability, mental and physical health.
> (4) The capacity and interest of each parent to provide for the emotional, social, moral, material, and educational needs of the child.
> (5) The interpersonal relationship between the child and each parent.
> (6) The interpersonal relationship between the child and its siblings.
> (7) The effect on the child of continuing or disrupting an existing custodial status.
> (8) The nature of each proposed environment, including its stability or wholesomeness.
> (9) The preference of the child, if the child is of sufficient age and maturity.
> (10) The report and recommendation of the attorney for the child or other independent investigator.
> (11) Available alternatives.
> (12) Any other relevant matter the evidence in a particular case may disclose.

Also relevant to this decision are the factors of continuity, stability, communication, and approximation. *See In re Marriage of Hansen*, 733 N.W.2d 683, 700 (Iowa 2007). Not all factors are given equal consideration, and the weight attributed to each factor depends on the specific facts and circumstances of each case. *See In re Marriage of Williams*, 589 N.W.2d 759, 761 (Iowa Ct. App. 1998).

At the conclusion of the trial, the district court told the parties:

> I do want both of you [Pauschers] to know, too, that this is going to be a very tough decision for me. This is not a slam-dunk for either one of you. This is really probably the most difficult custody case I have had yet. There are troubling things about this.

In its decree, the district court focused on the relationship Constance has with Glaspie. *See generally In re Marriage of Decker*, 666 N.W.2d 175, 179 (Iowa Ct. App. 2003) (noting "if a parent seeks to establish a home with another adult, that adult's background and his or her relationship with the children becomes a significant factor in a custody dispute"). The court did not make specific credibility findings, but the tone of the opinion in several locations demonstrated a greater reliance on the testimony of Curtis and the evidence in support of his contentions. The district court clearly held Constance primarily responsible for the negative tone of communications between the parties concerning the children but failed to consider the open communication Curtis admitted Constance maintained regarding the children's activities, schooling, and appointments. The district court also did not believe Constance's testimony that Curtis is an angry person who abuses alcohol. The district court impliedly found that Constance downplayed Glaspie's history of troubling behaviors and violent tendencies and overplayed allegations of Curtis's abusive behaviors. The district court was also concerned about Constance's troubling relationship with Connett and the fact Constance allowed the Pauscher children to be exposed to that conflict, while implicitly blaming Constance for all the troubles associated with that relationship. The court contrasted those facts with positive findings about Curtis's girlfriend, that she is a positive role model who has remained above the fray of the conflict between Constance and Curtis, while ignoring the fact that Curtis and his girlfriend had become friends with Connett—facts that clearly fueled the flames of those problems.

The district court was also critical of Constance enrolling the children in a different school district after the parties' separation without having discussed it with Curtis first. Our review of the record shows the petition for dissolution of marriage was filed on June 13, 2013. Around that time, Constance asked Curtis to move out of the house and live with his father and stepmother. He refused. So, she moved with the children into her parents' home in Slater. In July she was awarded temporary physical care and enrolled the children in the local school district where she and the children were living. We cannot find fault with that decision. Also, Curtis admits she informed him where they were enrolled and gave the school contact information for Curtis including his email address so he had access to school information concerning the children.

Aside from the analysis of the factor concerning Constance's relationship with Glaspie, and some references to communication, the decree does not disclose analysis of the other factors we consider applicable. There are factual findings that implicate those factors but provide no analysis or weighing as between the parties. The court obviously did not like Constance or some of the decisions she made. "Care must be taken, however, to distinguish between likeability of the witness and credibility: credibility and likeability do not necessarily correlate." *In re P.C.*, No. 16-0893, __ WL __, at *__ (Iowa Ct. App. Aug. 17, 2016) (Mullins, J., specially concurring); *see also* Iowa Civ. Jury Instructions 100.9. Ultimately, we "must decide in whose custody the long-range best interest of the children will be better served." *In re Marriage of Weidner*, 338 N.W.2d 351, 359 (Iowa 1983).

First, we note that, as the district court found, both parties are very capable of caring for the day-to-day material needs of their children. Both parents are gainfully employed and trained in their respective fields. Each parent is a suitable custodian, capable of providing for the emotional, social, moral, material, and educational needs of the children.

The record reflects that Constance has been, throughout the life of these three children, their primary caregiver. *See Hansen*, 733 N.W.2d at 697 (noting "the caregiving of parents in the post-divorce world should be in rough proportion to that which predated the dissolution"). In marriage, Constance cared for the children while Curtis was gone for months at a time on assignments earning much-needed financial support for the family. During the prolonged separation leading to this dissolution, Constance has had physical care, with Curtis actively engaging in the visitation available to him.

It is apparent from the testimony and evidence presented that the children thrived while in Constance's physical care. *See id.* ("[S]uccessful caregiving by one spouse in the past is a strong predictor that future care of the children will be of the same quality."). The school-aged children continued to do well in school and even received special honors from their school for their performances. The concepts of continuity, stability and approximation from *Hansen* clearly favor Constance. *See id.*; *see also* Iowa Code § 598.41(3)-(4); *Winter*, 223 N.W.2d at 166-67 (factors 2 and 4).

At trial, Curtis admitted Constance had allowed him visits with the children in excess of those allowed under the temporary order. Constance indicated that, were she given physical care, she would ask the court to increase the amount of

visitation Curtis was receiving with the children. Curtis initially indicated he would recommend liberal visitation for Constance, but subsequently requested minimal visitation based on Constance's involvement with Glaspie.

The record also reflects that, while in Constance's care, the parties have been able to successfully communicate about the children's schedules and activities. *See In re Marriage of Clark*, No. 12-2192, 2013 WL 3291834, at *4 (Iowa Ct. App. June 26, 2013) ("A significant factor in the physical care determination is the ability of each parent to communicate effectively with the other about the needs of their children."). Constance created a calendar to keep Curtis notified of all events, signed Curtis up to receive school communications, and has generally kept Curtis apprised on matters concerning the children. While the record also reflects the parties have had contentious communications—and the district court made findings clearly placing much of that responsibility on Constance—this has not prevented the parties from discussing the needs of their children. We determine communication as a factor is neutral as between the parties.

The record also reflects that both parties have engaged in behaviors that have antagonized the situation between them. Constance has verbally engaged Glaspie's ex-wife, Connett, resulting in harassment charges against her. Post-separation, Curtis and his girlfriend have created a friendship with Glaspie's ex-wife, which he admitted at trial "adds fuel to the fire" regarding his disputes with Constance. Like the district court, we find Constance's conflicts with Connett disturbing, but question whether all the blame rests on Constance. And while we

agree Constance should avoid allowing the children to witness the conflicts with Connett, we do not consider that circumstance a deciding factor.

At trial, Constance made certain allegations regarding Curtis's physical and emotional actions toward her. These allegations, based on their lack of substantiation beyond Constance's father's testimony, were given little weight by the district court.

While we are cognizant of the district court's concerns regarding Glaspie's past criminal record—including his three convictions for domestic abuse, which are a decade to two decades old—we are concerned the district court seemingly hinged the entire custody decision on Constance's decision to have a relationship with Glaspie. *See generally Decker*, 666 N.W.2d at 179 (finding "the numerous charges [against the mother's] companion . . . most of which are three to five years old" did "not preclude [the mother] from receiving primary care"). The record reflects a history of issues between Glaspie and his ex-wife, which now involve their twelve-year-old child, but the record reveals no concerns regarding Glaspie's other children. More importantly, the record reflects that no allegations have been made—and no investigations have been instituted—with regard to the Pauscher children or Constance.

While we understand the concerns voiced by Curtis concerning Glaspie's history, which were embraced by the district court, that is but one factor to be considered. We do not find the record supports a determination there is such a risk of harm to the Pauscher children as to outweigh the other factors that were not addressed by the district court in its decree, including those of approximation, continuity, and stability; the fact the children have thrived when in the mother's

physical care; the fact Constance has supported Curtis's contact with the children; and Curtis's admission Constance ensures his access to information regarding the children's activities, schooling, and appointments.

As we consider all the applicable factors for physical-care determinations set forth by our legislature and in our case law, we disagree with the district court's conclusion and find the long-term best interests of the children are best served by an award of physical care to Constance.

When one party has been awarded physical care, the other parent should receive visitation that assures the children "the opportunity for the maximum continued physical and emotional contact with both parents." Iowa Code § 598.41(1)(a). We must also balance the practicalities of day-to-day life. We determine Curtis shall have visitation with the children every Tuesday from 4:30 p.m. to 8:00 p.m.; on Thursdays from 4:30 p.m. to 8:00 p.m. on weeks when he does not have weekend visitation; and weekend visitation every other weekend, starting on Thursday at 6 p.m. and ending on Sunday at 6 p.m. The other visitation provisions remain as ordered by the district court.

### B.      Retirement Assets

Constance contends the district court erred in valuing the parties' retirement assets as of the date of separation.[6] As a general rule, "[t]he value of the assets . . . should be determined as of the date of trial." *In re Marriage of Driscoll*, 563 N.W.2d 640, 642 (Iowa Ct. App. 1997). The district court provided

---

[6] In his brief, Curtis alleges Constance failed to preserve error on this issue because she did not raise it in her motion to enlarge or amend. This dispute was clearly before the district court at the time of trial and was raised by Constance in her motion to enlarge or amend. We find error was preserved.

no explanation for its deviation from this rule, beyond noting that the parties did not share expenses or financial planning during their separation and that the parties have similar incomes. While "[t]here may be occasions when the trial date is not appropriate to determine values," *id.*, this is not one of those circumstances. We find the parties' retirement assets should have been valued as of the date of trial.

### C.     Property Distribution[7]

Constance requests she be awarded $17,000 as a property settlement. In matters of property distribution, we are guided by Iowa Code section 598.21. The parties in a dissolution action "are entitled to a just and equitable share of the property accumulated through their joint efforts." *In re Marriage of O'Rourke*, 547 N.W.2d 864, 865 (Iowa Ct. App. 1996). Iowa law does not require an equal division, but rather "what is fair and equitable in each circumstance." *In re Marriage of Campbell*, 623 N.W.2d 585, 586 (Iowa Ct. App. 2001).

At trial, the district court made the following distribution: Curtis was awarded the marital home that was in foreclosure; each party was awarded his or her own savings and checking account; each party was awarded the vehicle registered in his or her individual name; each party was awarded the household contents already in his or her possession, except Constance was given the washer and dryer held by Curtis; the retirement assets were divided pursuant to *In re Marriage of Benson*, 545 N.W.2d 252 (Iowa 1996); each party was

---

[7] Again, Curtis raises error preservation. Again, this matter was clearly disputed by the parties at trial and resolved by the district court's order. We find error was preserved.

responsible for his or her own student loans; and each party was responsible for whatever debt was held in his or her name.

Constance claims the district court erred in its consideration of the equitable distribution of the property. First, she contends the district court improperly concluded that, after the parties separated, "Curtis attempted to catch up with the mortgage payments with no assistance from Constance, even though she was living rent-free at her parents' house." The record demonstrates Constance left the marital home in July 2013, Curtis made partial payments until February 2014, and Curtis ceased making any payments since that time. The record does not address whether Constance paid rent while living with her parents. Regardless, the property is in foreclosure, and Curtis has been assigned any debt or expense resulting from that foreclosure.

Second, Constance notes Curtis sold certain marital assets without her approval, despite an order to preserve assets. At trial, Curtis admitted he had sold a refrigerator, a microwave, and a stove between December 2014 and January 2015 without telling Constance, making approximately $250 on those sales. Curtis indicated he believed he could sell the property because Constance had provided a list of the items she wanted from the marital property and these items were not on the list. Curtis also sold a dishwasher he had received during the marriage as a gift from his parents and the children's swing set for $75.[8] While it is clear Curtis disposed of certain assets in violation of the

---

[8] Curtis also traded in a truck—the loan for which was paid off by Constance with the money she received from her accident settlement—for a Buick Rainier in July 2015, after the order to preserve assets was entered in June 2013. Curtis subsequently sold the Buick Rainier for $3000, which he used to pay his counsel.

order to preserve, Constance also received property from the marital home prior to trial and has failed to provide any evidence of the value of those items. On the record made by the parties, we are unable to determine if the division of the assets was unequitable.

Third, Constance contends she left the marriage with considerably more debt than Curtis: Constance having approximately $10,000 in a car loan, $17,000 in potential unsubrogated medical debt, $60,000 in student loans, and $31,000 in other debts; and Curtis having approximately $5000 in credit card debt, $9000 in a car loan, and the mortgage in foreclosure. Again, beyond the medical debt addressed below, Constance has failed to provide any demonstration of how the debt could be more equitably distributed.

In its order, the district court determined Constance was not entitled to any reimbursement for the proceeds she received from an automobile accident, the entirety of which was spent during the course of the marriage. While we agree the proceeds were marital sums for which Constance should not receive reimbursement, the parties agreed a possible subrogation claim remained and the parties should each bear half of the cost of whatever claim is brought, if any. We therefore modify the decree to provide that each party will bear half of any subrogated amount from that automobile accident. The property distribution is otherwise affirmed.

### D. Appellate Attorney Fees

Constance requests appellate attorney fees. "Appellate attorney fees are not a matter of right, but rather rest in this court's sole discretion." *In re Marriage of Okland*, 699 N.W.2d 260, 270 (Iowa 2005). In determining whether to award

attorney fees, we consider "the needs of the party seeking the award, the ability of the other party to pay, and the relative merits of the appeal." *Id.* Having considered these factors, we determine the parties shall pay their respective attorney fees. Costs shall be assessed one-half to each party.

### IV.   Conclusion

For the foregoing reasons, we conclude physical care should have been placed with Constance. We modify the visitation schedule as set forth above. We also modify the date for valuation of the parties' retirement assets to the date of trial. We further modify the decree to provide that each party will bear half of any subrogated amount resulting from Constance's 2010 automobile accident; we do not otherwise disturb the property distribution. We remand for a determination of child support consistent with this opinion along with other related financial support matters including, but not limited to, medical expenses and tax returns.

**AFFIRMED AS MODIFIED AND REMANDED.**